Filed 6/1/15  Steel v. Wornall CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT


| | |
|---|---|
| EVE STEELE, | B255937 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC497135) |
| v. | |
| WOOD WORNALL et al., | |
| Defendants and Appellants. | |


APPEAL from an order of the Superior Court of Los Angeles County, Suzanne G. Bruguera, Judge.  Affirmed.

Castro & Associates, Joel B. Castro, David H. Pierce and Ruth Scott for Defendants and Appellants.

Towle Denison Smith & Maniscalco and Michael C. Denison for Plaintiff and Respondent.


* * * * * *

Defendants Wood Wornall and Jennifer Rangel (collectively, the Wornalls) appeal from the trial court's order denying their special motion to strike under Code of Civil Procedure section 425.16[1] (the anti-SLAPP[2] statute). We hold the Wornalls' alleged conduct did not involve protected activity for purposes of the anti-SLAPP statute. We therefore affirm.

## FACTS AND PROCEDURE

### 1. *Allegations of the Complaint*

Eve Steele brought this lawsuit against the Wornalls, Tere Cruz, and Tina Cruz in December 2012.[3] In pertinent part, the complaint alleged as follows.

Steele breeds Australian Terriers, a breed of purebred dogs that the American Kennel Club recognizes. Steele has developed lines of award-winning and championship Australian Terriers recognized throughout the world as superior and valuable. She cobreeds and co-owns various Australian Terriers with Marjo Ahola, a resident of Finland.

The Wornalls are father and daughter and have a business that provides "professional dog handling, training, grooming, breeding and caring for and transporting dogs owned by persons other than themselves." For the nine years prior to the filing of the complaint, the Wornalls acted as professional dog handlers for Steele's dogs.

The Cruzes are sisters. In or about 2006, Steele permitted Tere to conditionally possess one of Steele's dogs (Queenie) as a pet. In exchange for the enjoyment of housing the dog in her home, Tere agreed to take good and continuing care of the dog

[1]   Further undesignated statutory references are to the Code of Civil Procedure unless otherwise noted.

[2]   Strategic lawsuit against public participation.

[3]   The Cruzes are not parties to this appeal. We will occasionally refer to the Cruzes by their first names to avoid confusion.

2

and to make the dog available to Steele for showing and breeding purposes. The parties agreed Steele and co-owner Ahola would retain all ownership rights to the dog. The agreement constituted an oral contract between Steele and Tere, which was accepted by Tina, with whom Tere resided at the time. After Queenie died in June 2007, Steele arranged for another of her dogs (Macy) to be placed with the Cruzes as a pet on the same terms and conditions applicable to Queenie. Under Steele's direction, Macy was bred to another of Steele's dogs and birthed a litter of puppies while she lived with the Cruzes. Tere whelped the puppies with assistance from Tina and with additional assistance and direction from Steele. Steele and Ahola co-owned all of the puppies and registered them with the American Kennel Club in Steele's and Ahola's names.

Tere requested that one of the puppies (Linguini) live with her as an additional pet and companion for Macy, and Steele agreed. The same terms and conditions applicable to Macy applied to Linguini. Steele eventually bred Linguini to another owner's dog. She arranged for the breeding to be effected by Wornall at the Wornalls' kennel and paid them for all boarding and professional fees. In June 2011, Linguini birthed two puppies (Mac and Ravi), who were again whelped by Tere with assistance from Tina. Steele and Ahola also co-owned Mac and Ravi and registered the puppies in Steele's and Ahola's names, and the puppies lived with the Cruzes under the same terms and conditions as the other dogs. They all agreed, however, that Ahola would take one puppy to show and breed in Finland. Ahola would come to the United States for the purpose of seeing Mac and Ravi and choosing one. Ahola made the trip in June 2012 and selected Mac to take home.

Beginning in June 2012, at Tere's request, Steele permitted the Wornalls to show Mac and Ravi, and Ahola delayed taking Mac back to Finland. The Wornalls acted as handlers for the dogs in several shows in 2012. Steele asked the Wornalls to send her the bills for their services. After a period of not receiving such bills, Steele tried to reach the Wornalls with no success. Subsequently, they informed Steele that the Cruzes exclusively owned Mac and Ravi, that their clients were the Cruzes, and

3

that they took instructions exclusively from the Cruzes. Also, for the first time, Tere asserted an ownership interest in Mac, Ravi, and all other dogs Steele had placed with the Cruzes. The Cruzes refused to deliver Mac to Ahola or Steele, unless Steele acceded to the Cruzes' new ownership claims. In this way, the Wornalls and the Cruzes had conspired to gain ownership and control of the showing and breeding arrangements for the dogs for defendants' mutual benefit. The Cruzes had retained physical custody of the dogs and refused to deliver them to Steele as of the filing of the complaint.

Steele alleged 12 causes of action in the complaint, including defamation and extortion. The defamation cause of action alleged that, in furtherance of defendants' plan to deprive Steele of her ownership rights in the dogs, the Wornalls published false information about Steele. Specifically, they published untrue statements that (1) Steele did not pay their bills or the bills of another professional handler and (2) that Steele had violated certain ethical rules and regulations of the Australian Terrier Club of America (ATCA). The cause of action also incorporated by reference allegations that the Wornalls had published false claims of ownership regarding Steele's dogs. As a result of all the false and defamatory statements, Steele had suffered damage to her "reputation and good name, as an owner, breeder and exhibitor of purebred dogs, and as a longtime member of [the] national breed club, thereby damaging and threatening to damage [her] ability to pursue said activities and other activities in the future."

The extortion cause of action alleged that, in furtherance of defendants' plan to deprive Steele of her ownership rights, the Wornalls and the Cruzes made false and baseless claims of ownership rights in the dogs to third parties. They made these claims for the purpose of pressuring Steele to accede to the Cruzes demands for ownership of the dogs. Further, defendants caused Steele to receive a threat in the form of a September 2012 letter from an attorney, "whereby [they] threatened to take and pursue and prosecute action against [Steele] before the Board of Directors of the ATCA, based on false allegations of misconduct." The letter's subject line stated, "Re: Dispute Regarding Ownership of Australian Terriers." The body of the letter

stated in its entirety: "This office has been retained by Tere Cruz with regard to the ownership of two Australian Terriers bred by Eve Steel [*sic*]. Please direct all further communications to this office. It is my intention to move expeditiously on this matter and to request and/or demand a disciplinary hearing before the ATCA board of Directors under Article Vl. As specified this matter could be convened within three to six weeks at a mutually acceptable date and location. Please advise this office of the name and address of your retained counsel." Defendants threatened Steele with action before the ATCA even though they knew the body was incapable of adjudicating ownership issues and was limited to hearing complaints of alleged violations of the ATCA code of ethics. They also knew the only possible outcome of a proceeding in which they prevailed would be censure or other action against Steele's ATCA membership status, such as expulsion. They further knew that an ATCA proceeding, irrespective of its outcome, would become public and known to all ATCA members. Accordingly, by making such a threat, defendants "were intentionally extorting [Steele] with the threat of, at a minimum, public embarrassment, in a critically important peer group for [Steele] and with intent to damage [Steele]'s reputation."

## 2. *Anti-SLAPP Motion*

The Wornalls filed an anti-SLAPP motion to strike the defamation and extortion causes of action. The Wornalls argued their alleged acts were protected activity under section 425.16, subdivision (e)(2), (3), and (4). Moreover, they argued Steele could not establish a probability of prevailing on the pertinent causes of action. As to defamation, they asserted (1) Steele could not show the Wornalls' alleged statements were false, and (2) the "common interest" privilege established by Civil Code section 47, subdivision (c)(1) protected the alleged statements. As to extortion, they asserted Steele could not establish the alleged extortion caused her to pay money to any defendant, which they maintained was an essential element of the cause of action.

The Wornalls requested that the court take judicial notice of facts stated in several documents printed out from websites. These documents included the history

5

of the Australian Terrier from the ATCA website; the ATCA's constitution from the ATCA website; the ATCA's 2011 bylaws and code of ethics from the ATCA website; the calendar of events from Long Beach's official online travel and entertainment guide, showing the Great Western Terrier Association Dog Show on June 25-26, 2011; and the history of the American Kennel Club from the club's website. From these documents, the Wornalls wanted the court to take judicial notice that the ATCA became an American Kennel Club member club in 1977; that the American Kennel Club had almost two million dogs competing in over 15,000 member, licensed, and sanctioned events by 1998, and had registered more than 1.2 million dogs and 555,000 litters; and that the Great Western Terrier Show in Long Beach in June 2012 was free to the public. They relied on the ATCA code of ethics to show, among other things, that the code required a written contract before placing one's dog with another person. The Wornalls based their argument that Steele had violated the ATCA code of ethics on her failure to use a written contract in placing her dogs with the Cruzes.

Steele opposed the anti-SLAPP motion on the ground that the commercial speech exception to the anti-SLAPP statute (§ 425.17, subd. (c)) applied. She further argued the Wornalls had not shown their acts constituted protected activity under the anti-SLAPP statute, and even if they had, she had established a probability of prevailing on the challenged causes of action. Steele filed five declarations in support of the opposition, including her own, her husband's, her attorney's, her daughter's, and a cobreeder's.

### 3. *Court's Ruling on the Anti-SLAPP Motion*

Preliminarily, the court stated it was denying the Wornalls' request for judicial notice of *facts*. It took judicial notice of the *documents* submitted by the Wornalls, "but not the truth of the matters asserted within the documents." It also ruled on the Wornalls' numerous objections to the declarations Steele submitted, overruling some and sustaining others.

Turning to the substance of the motion, the court denied it, explaining the Wornalls had not shown the alleged defamatory statements were protected activity

6

under either subdivision (e)(3) or (4) of section 425.16—that is, the Wornalls did not make the statements in a public forum or in connection with an issue of public interest. The court similarly found the alleged extortion did not involve protected activity—there was no evidence the September 2012 letter involved a public issue or an issue of public importance. In light of these rulings, the court did not reach the second prong of the analysis, whether Steele had shown a probability of prevailing on the challenged causes of action. The Wornalls filed a timely notice of appeal.

**DISCUSSION**

The anti-SLAPP statute provides that a cause of action arising from any act of a person in furtherance of that "person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Thus, a court's task in ruling on an anti-SLAPP motion is a two-step process. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity" (an act "in furtherance of the person's right of petition or free speech . . . in connection with a public issue"). (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67; § 425.16, subd. (b)(1).) Second, if the defendant makes such a showing, the court "determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises*, at p. 67.) "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.) "In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) We review the trial court's ruling de novo. (*Tutor-Saliba Corp. v. Herrera* (2006) 136 Cal.App.4th 604, 609.)

7

We agree with the trial court that neither of the challenged causes of action arises from protected activity.  In view of this holding, we need not reach the second prong of the statute and determine whether Steele has a probability of prevailing.

## 1.  *The Defamation Cause of Action Does Not Arise from Protected Activity*

The Wornalls contend the defamation cause of action arises from protected activity under subdivision (e)(3) or (4) of section 425.16.  Under subdivision (e)(3), the statute protects statements and writings "made in a place open to the public or a public forum in connection with an issue of public interest."  (§ 425.16, subd. (e)(3).)  Under subdivision (e)(4), the statute protects "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."  (§ 425.16, subd. (e)(4).)  Subdivision (e)(3) requires a public forum, while subdivision (e)(4) does not.  Thus, subdivision (e)(4) applies even to private communications, so long as they concern an issue of public interest.  (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 736.)  The two types of protected activity both require conduct in connection with an issue of public interest.[4]

The Wornalls argue the alleged defamatory statements about Steele's nonpayment of bills and violation of ATCA ethical rules concern a matter of public interest.  They assert the ATCA is a national breeding club, and its code of ethics exists to promote the safe and healthy breeding of purebred dogs.  Further, they argue that because the safe and healthy treatment of dogs is of widespread public interest, a breach of the code of ethics is of widespread concern to those within the ATCA

---

[4]    Although section 425.16, subdivision (e)(4) refers disjunctively to "a public issue *or* an issue of public interest" (italics added), there appears to be no substantive difference between the two.  (See *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119 [applying the same standard to "the public issue/issue of public interest requirement of section 425.16, subdivision (e)(3) and (4)"].)

community, the American Kennel Club community, and the population in general. They emphasize that Steele herself alleged the defamatory statements harmed her publicly within the ATCA community.  We are not persuaded by these arguments.

The anti-SLAPP statute does not define an issue of public interest or public issue, and as at least one court has noted, "it is doubtful an all-encompassing definition could be provided." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 (*Weinberg*).)  Courts have construed "issue of public interest" broadly "to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479.)  In one case, *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 919-924 (*Rivero*), the court surveyed a number of cases on the issue and identified three categories of statements falling within the public interest.  The statements concerned either (1) "a person or entity in the public eye," (2) "conduct that could directly affect a large number of people beyond the direct participants," or (3) "a topic of widespread public interest." (*Id.* at p. 924.)  Considering these categories, the *Rivero* court determined the statements at issue there did not concern a matter of public interest. (*Id.* at pp. 924-925.)  The statements were made by a union in documents distributed to union members and concerned a supervisor's alleged mistreatment of his eight-person staff of custodians. (*Id.* at pp. 916-917.)  The court noted that the supervisor previously received no public attention or media coverage and the only individuals affected by the situation were the supervisor and his eight employees. (*Id.* at p. 924.)  The union argued that any time a person criticizes an unlawful workplace activity, the statements concern a public issue. The court rejected this argument, observing that if this were correct, nearly every workplace dispute would qualify as a matter of public interest.  Instead, there must be some threshold level of significance, which was not met in the case. (*Ibid.*)  The dispute was an isolated incident and not part of a larger union dispute. (*Id.* at p. 927.)

9

Similar to the *Rivero* court, the court in *Weinberg* articulated "[a] few guiding principles . . . derived from decisional authorities." (*Weinberg, supra*, 110 Cal.App.4th at p. 1132.) "First, 'public interest' does not equate with mere curiosity. [Citations.] Second, a matter of public interest should be something of concern to a substantial number of people. [Citation.] Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. [Citations.] Third, there should be some degree of closeness between the challenged statements and the asserted public interest [citation]; the assertion of a broad and amorphous public interest is not sufficient [citation]. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy . . . .' [Citation.] Finally, 'those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.' [Citation.] A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." (*Id.* at pp. 1132-1133.)

The *Weinberg* plaintiff and defendant were token collectors. The defendant had accused the plaintiff of stealing tokens at a token show and published such statements in a newsletter and letters sent to fellow token collectors. (*Weinberg, supra*, 110 Cal.App.4th at p. 1128.) The national token collectors' group that published the newsletter consisted of approximately 700 members. (*Id.* at p. 1127.) The defendant also contacted a police officer and told the officer that the plaintiff had a violent temper, people would fear for their lives if the plaintiff attended an upcoming token show, and the plaintiff had been stealing at several shows. (*Id.* at p. 1129.) The court held the defendant failed to demonstrate his alleged statements concerned "anything other than a private dispute between private parties." (*Id.* at p. 1134.) The court rejected the argument that the defendant had accused the plaintiff of criminal activity, and criminal activity was always a matter of public interest. (*Ibid.*) The defendant admitted that he did not contact the officer to report a theft. Rather, he contacted the officer out of concern for the safety of his fellow token collectors. (*Id.* at p. 1129.)

The evidence showed his actions were part of "a private campaign, so to speak, to discredit plaintiff in the eyes of a relatively small group of fellow collectors." (*Id.* at p. 1135.)

Like in *Weinberg* and *Rivero*, the communications here did not concern a matter of public interest. First, there is no evidence that Steele was a figure in the public eye. The Wornalls point to the allegation in the complaint that she is a "well-known" breeder with a 20-year reputation for honesty and ethics in breeding. The allegation does not demonstrate that Steele had special prominence or power and influence in society at large, nor does it show that she positioned herself at "the forefront of a particular public controversy in order to influence the resolution of the issues involved." (*Weinberg, supra*, 110 Cal.App.4th at p. 1131.) This distinguishes this matter from a case like *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 230, in which the plaintiff was a nationally known political consultant who media outlets prominently featured and whose clients included a number of prominent politicians. Second, the Wornalls' alleged statements that Steele had not paid her bills, that she had violated the ATCA ethical rules by failing to use a written contract with the Cruzes, and that the Cruzes were the true owners of the dogs directly affected only a small group of seven. This group consisted of Steele, her co-owner Ahola, the Cruzes, the Wornalls, and one other handler whose bills Steele had purportedly failed to pay. The larger community of Australian Terrier breeders or members of the ATCA had no direct stake in these private controversies between private individuals. Even if other members of the ATCA community might find the disputes interesting as observers, mere curiosity is not enough. Third, the assertion of a broad and amorphous public interest in the safe and healthy treatment of dogs is also not enough. The general purpose of the ATCA code of ethics may very well be to

11

protect Australian Terriers.[5] But again, Steele's failure to use written contracts with the Cruzes—conduct she argues was not actually a breach of ethics rules—involved only those parties and a handful of dogs. It is not as though her conduct endangered the welfare of the breed as a whole. The connection to a general interest in the welfare of dogs is abstract. Fourth, according to Steele's allegations, the focus of the Wornalls' conduct was not a public interest in the welfare of dogs. Rather, they published statements about her nonpayment of bills and ethical violations to force her to transfer ownership of the dogs to the Cruzes. Their focus was their private dispute over ownership. Fifth, the Wornalls could not elevate this into a public issue merely by communicating their allegations to a large number of people. It is circular, unpersuasive reasoning to say an issue is a matter of public interest because it is communicated to the public. Thus, Steele's allegations of public embarrassment because of the Wornalls' statements, or her allegations that the threatened ATCA disciplinary proceedings would eventually become public knowledge, do not establish a public interest issue.

The Wornalls rely on *Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392 (*Traditional Cat*), a case that does not persuade us. The parties in the case were cat breeders who held leadership positions in the Traditional Cat Association (TCA). The plaintiff, Fineran, was the president of the TCA, and the defendants were other officers or directors. Fineran left to establish a rival association when a dispute developed over her leadership. She sued the defendants for

---

[5] The Wornalls argue the court erred in not taking judicial notice of the truth of facts stated in the ATCA code of ethics, as well as the various other documents in their request for judicial notice. Assuming for the sake of discussion that this was error, they have not shown prejudice. Our analysis is not changed by the facts in the ATCA documents (constitution, bylaws, and code of ethics), the facts about the history of the Australian Terrier, the facts about the numbers of dogs and members in the American Kennel Club, and the fact that the Great Western Terrier Show in Long Beach was open to the public.

12

misappropriating TCA funds, copyright infringement, and trademark infringement, among other things. (*Id.* at pp. 395-396.) In response to her lawsuit, one of the defendants created a website purporting to report on the litigation, including highly critical descriptions of Fineran. (*Id.* at p. 396.) Fineran then sued the defendants for defamation based on these website statements. (*Ibid.*) The trial court found the defendants had established protected activity under the anti-SLAPP statute but denied their anti-SLAPP motion for reasons relating to the second prong (the plaintiff's probability of prevailing). (*Ibid.*) The vast majority of the court of appeal's decision focused on the second prong. Before getting to the second prong, the court considered the protected activity prong in a cursory manner, stating that the trial court's ruling on the first prong "was plainly correct," and "[g]iven the controversy surrounding the parties' dispute and its evident notoriety in the cat breeding community, the Web site statements concerned matters of public interest in the cat breeding community." (*Id.* at p. 397.) We are not convinced by the brief treatment of the issue in *Traditional Cat*. There was no discussion of the various factors identified in *Rivero* or *Weinberg*. Additionally, we are not convinced the dispute in *Traditional Cat* was akin to the private dispute here. The *Traditional Cat* controversy involved the leaders of the community directly and their actions in governing the association. Members of the association would have a direct stake in how their leaders governed their community. Not so here. This case does not involve Steele's, the Cruzes', or the Wornalls' governance (or misgovernance) of the community.

Other cases on which the Wornalls primarily rely are likewise distinguishable. *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456 involved an ongoing dispute and debate between certain homeowners in a 523-lot development and their homeowners association (HOA). The dispute centered on the HOA's refusal to approve the homeowners' architectural plans for a new residence. (*Id.* at p. 1462.) The court approved of the rule that "'in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a

13

minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance.'" (*Id.* at p. 1468.) The court explained the 523 lot owners were a definable community, the approval of the architectural plans was an ongoing governance dispute in which all owners had a stake, and the HOA's attorney wrote letters containing allegedly defamatory statements in the context of this dispute. (*Id.* at pp. 1468-1469.) Along the same lines, *Damon v. Ocean Hills Journalism Club, supra*, 85 Cal.App.4th 468 involved homeowners and governance by their HOA. More specifically, the alleged defamatory statements concerned whether to be self-governed or hire a professional management company and the plaintiff's competency to manage the HOA. (*Id.* at p. 479.) Further, the statements were made in connection with HOA board elections and recall campaigns. (*Ibid.*) The court held these inherently political questions were public issues within the defined community. (*Id.* at p. 478.)

In this case, we are not dealing with these kind of inherently political or governance questions. The leadership of the ATCA and the American Kennel Club are not parties to this dispute, nor are those leaders' decisions or capabilities at issue. Further, there was no pending disciplinary action against Steele or any other party and thus no ongoing dispute or debate in which the ATCA membership needed to participate. This is, at its core, a private dispute between private parties.

## 2. *The Extortion Cause of Action Does Not Arise from Protected Activity*

The Wornalls contend the extortion cause of action also arises from protected activity under subdivision (e)(3) or (4) of section 425.16. They primarily contend that the alleged threat of ATCA disciplinary proceedings to determine ownership of the dogs concerned a matter of public interest, as they contend with the defamation cause of action. For the same reasons we cite in part 1. of the Discussion, statements about Steele's alleged breach of the ATCA code of ethics and the true ownership of the dogs do not concern a public issue.

14

They also appear to argue, albeit perfunctorily, that the attorney's September 2012 letter advising Steele of contemplated ATCA disciplinary proceedings was protected activity under subdivision (e)(2) of section 425.16. Subdivision (e)(2) protects "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or *any other official proceeding authorized by law*." (§ 425.16, subd. (e)(2), italics added.) They assert the letter was "intimately intertwined with, and preparatory to, the filing of official disciplinary proceedings before the ATCA."

This argument fails. The ATCA is not a legislative, executive, or judicial body. The resolution of this issue thus turns on whether ATCA proceedings are another "official proceeding authorized by law." For example, our Supreme Court held that a hospital peer review procedure was an official proceeding authorized by law for purposes of the anti-SLAPP statute because Business and Professions Code section 805 et seq., governing hospital peer review proceedings, required the procedure. (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199.) Similarly, one court held that state bar sponsored fee arbitration is an official proceeding authorized by law because it was "established by statute to address a particular type of dispute." (*Philipson & Simon v. Gulsvig* (2007) 154 Cal.App.4th 347, 358.) By contrast, a demand commencing private contractual arbitration was not protected activity because such arbitration was not an official proceeding authorized by law within the meaning of the statute. (*Century 21 Chamberlain & Associates v. Haberman* (2009) 173 Cal.App.4th 1, 9.)

Here, the Wornalls do not identify the law that authorizes the ATCA disciplinary proceedings. They cite two cases, *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777 and *Cabral v. Martins* (2009) 177 Cal.App.4th 471. Both involved clear cases of protected petitioning activity. *Dove* involved a proposed complaint to the Attorney General seeking an investigation, a case of an executive branch body and governmental, administrative action. (*Dove, supra*, at p. 784.) *Cabral* involved communications in connection with judicial proceedings

15

(probate proceedings and litigation defense).  (*Cabral, supra*, at p. 480.)  These cases do not establish that ATCA disciplinary proceedings, which appear to be private proceedings, are official proceedings authorized by law within the meaning of section 425.16, subdivision (e)(2).

### 3.  *Any Purported Evidentiary Errors Do Not Require Reversal*

The Wornalls argue the court abused its discretion in overruling a number of objections to Steele's declarations.  While they assert error, they completely fail to demonstrate how these purported errors caused prejudice and require reversal.  The declaration paragraphs to which the Wornalls objected do not change our analysis of the protected activity issue.  We do not presume prejudice, and the appellant has the burden of affirmatively demonstrating prejudice.  (*Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 614.)  The Wornalls having failed in this respect, we decline to reverse, even if the court erred in its rulings.

### DISPOSITION

The order is affirmed.  Steele shall recover costs on appeal.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.

16